No. 46,157

Dick D. Huebert, *Appellee*, v. Federal Pacific Electric Company, Inc., *Appellant*.

(494 P. 2d 1210)

Opinion filed March 4, 1972.

*Robert M. Siefkin*, of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause, and *Jerry G. Elliott*, of the same firm, was with him on the brief for the appellant.

*Wilmer E. Goering*, of Clarkson, Goering & Banks, of Wichita, argued the cause, and *Earl M. Clarkson, Jr.*, of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

Owsley, J.: This is a products liability case involving an express warranty. The plaintiff recovered a jury verdict in the trial court and from this judgment defendant appeals.

The defendant's appeal is based upon two contentions: (1) The trial court erred in refusing to grant judgment for defendant as

a matter of law, and (2) the trial court erred in refusing to give defendant's requested instructions.

Plaintiff has been a journeyman electrician since 1958 and has been employed by Empire Electrical Contractors. In January, 1968, plaintiff installed a certain QMQB description panel board which included a 600 amp QMQB switch, at Kansas Cold Storage Company to bring its equipment up to city code specifications.

Defendant is the manufacturer of the 600 amp switch and has manufactured 10,000 to 11,000 switches since about 1960. Defendant, in its descriptive literature and specification sheets pertaining to the QMQB panel board, expressly warranted as follows:

"a. Integral handle mechanism for greater convenience. Handle mechanism and switch are combined into a single compact unit. This construction eliminates excess linkage, prevents misalignment as well as false indication of switch position.

"b. Cover interlock. Door opens only when switch is in "off" position. Interlock is voidable by authorized personnel.

"c. A cover interlock shall prevent opening the door over the fuse compartment unless the switch is in the "off" position."

After completing the installation, plaintiff switched the switches off and on and they all worked. He opened and shut the switch door several times but did not try to open the door while current was going through the box.

In late May, 1968, there was a malfunction in the electrical system at Kansas Cold Storage, apparently caused when a bolt of lightning struck the plant during an electrical storm. A 100 amp switch on the main description panel was charred and burned and there was visible smoke damage to the panel. Plaintiff was sent to effect repairs on Sunday of the Memorial Day weekend, June 2, 1968.

One of the three sets of movable contact blades fused or welded together, and in such condition the switch door opened with the switch in "off" position. An electrical charge of 440 volts remained in the welded phase of the three-phase switch.

Just prior to opening the panel door, plaintiff turned off two 100 amp switches and left a compressor on which was operated by a 200 amp switch. When he turned the 600 amp switch to "off" the compressor motor cut off and the room became completely quiet. When two of three phases are disconnected in a three-phase system, any motor in the system will not run even though 440 volts are still passing through one of the phases.

Plaintiff had two testers with him with which he could have tested the line for electricity, but he did not use them. In reliance on the "off" indicator of the 600 amp switch, plaintiff began to disconnect the "A" phase of the 600 amp switch with a screwdriver and removed one screw without incident. While removing a second screw, plaintiff received an electrical shock and burn which threw him part way across the room. The lights in the plant were off and plaintiff was using existing natural light from an open door to do his work.

When plaintiff opened the 600 amp switch, he observed the visible blades or clappers and they appeared straight, but he did not look to see whether they were up or down and he did not make certain they were either up or down. Plaintiff's employer testified that a person looking at the switch could not tell if the visible contacts were down or "on" unless he were familiar with the equipment; and he added that he would expect the man who installed the equipment to be familiar with it.

The "C" phase contact blades were welded shut, but the shock was received by plaintiff from the "A" phase. Voltage was running from the "C" phase of the 600 amp switch, through the 200 amp switch, through the compressor, out on "A" phase, back through the 200 amp switch, then up to the top of the 600 amp switch, on "A" phase.

After plaintiff's injury, Mr. Bare and Mr. Just of Shelley Electric were called to the plant. Electricity was disconnected at the transformer by Kansas Gas and Electric Company, the 600 amp switch removed, and the plant "temporaried" back into operation.

Mr. Just, a journeyman electrician, testified that he could not visually tell whether the blades on the 600 amp switch were open or shut, but assuming that all equipment went off when switches were thrown, in his opinion it would be safe to turn the 600 amp switch to "off."

Mr. Bare, a journeyman electrician of twenty years, testified that he was amazed that with the switch in "off" position there was still voltage. It was his opinion that, assuming all equipment went off when all switches were shut off, and that the 600 amp switch opened and one lug loosened, nothing else would necessarily have to be done before loosening the other lugs.

About two months after return to work, plaintiff returned to Kansas Cold Storage and installed a new 600 amp switch.

At trial plaintiff claimed permanent damage or injury due to burns on his arms, face, hands, and chest, with scarring. The trial court overruled defendant's numerous motions for judgment and submitted the case to a jury. The jury returned a verdict for the plaintiff.

Plaintiff's cause of action is based on the breach of an express warranty. He claims he is entitled to recover if he proves the product did not function as warranted and damage resulted therefrom.

When a manufacturer places a product on the market he impliedly warrants that the product is fit and suitable for the purposes it was sold. Further, that the product is safe and will not cause harm or injury to any person using the same in a normal manner. This is the obligation imposed on the manufacturer by operation of law in the interest of protecting the public.

In the highly competitive world of marketing and selling, manufacturers must seek and explore methods of increasing the sale of their products. One of these methods is the use of many forms of advertising which may include statements that their products will perform or not perform in a certain way. If pertinent, the advertising may claim certain safety features that assure a purchaser that the product will operate in a manner on which the purchaser can rely and no injury will occur.

These warranties are express rather than implied. A product so marketed is vested with implied warranties, but only such other warranties as the seller may express. Express warranties may extend to broader field and to broader responsibility than those implied. They may extend to any degree for which the seller wishes to assume responsibility. To the extent they exceed the implied warranty, they supplant the implied warranty. The implied warranty may remain intact, but only to the extent it has not been preempted.

We attempted to clarify the relation between express warranty and implied warranty in *Oliver Farm Equipment Co. v. Rich,* 134 Kan. 23, 4 P. 2d 465, stating:

". . . There is a division of authority as to whether an express warranty of quality will exclude an implied warranty of fitness for the purpose for which the article is manufactured. We think the better rule is, which is supported by authority consistent with the decisions of this court, where the manufacturer sells a machine on a written order describing it, an express warranty of quality will not exclude an implied warranty that the machine will do the things which

the description necessarily implies. There is nothing in the express warranty that excludes the obligation on the part of the appellee to deliver the engine described in the written order. . . ." (p. 28.)

Plaintiff established that defendant had expressly warranted the handle would not give a false indication, i. e., indicate it was "off" when in fact it was "on"; that the interlock device would preclude opening the door unless the handle was in the "off" position which in turn indicates: (a) when the handle is in the "off" position no electricity will flow through the switch, and (b) the door will not open unless the handle is "off" and in turn no electricity will flow through the switch. Plaintiff further states the warranty was breached in that the handle gave a false indication the electricity was off when in fact it was not off, and that the interlocking device permitted the door to open, again indicating the electricity was off when in fact it was not off. Plaintiff further argues that on proof of these facts and proof the breach was the cause of his injuries, he is entitled to recover.

Defendant claims that in order for plaintiff to recover he must show that the product was defective at the time it left the hands of the manufacturer, and cites *Evangelist v. Bellern Research Corporation,* 199 Kan. 638, 433 P. 2d 380, which was an action based on the breach of an implied warranty. He further argues that the plaintiff admitted as shown in the pretrial order that the product was not defective at the time it left the hands of the manufacturer. He further states that the court found as a matter of law that the product was not defective at the time it left the hands of the manufacturer. He concludes therefor that he was entitled to a directed verdict.

As hereinafter shown, this is a case of first impression. We do not have the benefit of previous decisions of this court involving express warranties except those actions by buyers against sellers, typical of which is *Naaf v. Griffitts,* 201 Kan. 64, 439 P. 2d 83. The issue here was not involved in the buyer-seller cases.

We recognize that there is a distinction between express warranty and implied warranty as hereinbefore demonstrated. We feel that the characteristics of express warranty actions are demonstrated in *Hansen v. Firestone Tire and Rubber Company,* 276 F. 2d 254, (6th Cir. 1960), involving an express warranty by the defendant manufacturer that its tires were safe enough to cling to the road on dangerous curves and provided greater road stability at any

speed. As a result of the failure of the tires while rounding a curve the plaintiff asserted liability against the defendant on the grounds of a breach of an express warranty. The court held that there was ample evidence to sustain the jury's finding as to the manufacturer's breach of an express warranty that the tires were safe enough to cling to the road on dangerous curves and had greater road stability at any speed, and that such breach was the proximate cause of the plaintiff's injuries. On page 258 the court said:

"In an action of the present character, the burden of proof resting upon the plaintiff entails merely demonstration that the goods did not have the properties warranted. In the absence of controverting evidence adduced by the defendant, which convinces the jury that the goods were as warranted, plaintiff should prevail. *Hertzler v. Manshum,* 228 Mich. 416, 200 N. W. 155. The plaintiff is not required to show the technical causation of the goods' failure to match their warranty. Nor is it necessary that the manufacturer's negligence be shown as the cause of such failure."

We approve the reasoning in the *Hansen* case. A summarized version of the express warranty in this case means that there was no electric current running through the panel when the handle was in the off position. This warranty was breached by the existence of electric current in the panel, directly contrary to the warranty expressed by the defendant.

Express warranty was not involved in *Evangelist.* The rule of Evangelist that the product must be defective at the time it leaves the hands of the manufacturer is inconsistent with express warranty. A manufacturer may by express warranty assume responsibility in connection with its products which extends beyond liability for defects. All express warranties must be reasonably construed taking into consideration the nature of the product, the situation of the parties, and surrounding circumstances. However, defects in the product may be immaterial if the manufacturer warrants that a product will perform in a certain manner and the product fails to perform in that manner. Defects may be material in proving breach of an express warranty, but the approach to liability is the failure of the product to operate or perform in the manner warranted by the manufacturer.

Defendant claims under the heading, "Defenses Dependent on Actions of Plaintiff," that contributory negligence and assumption of risk are defenses available to a manufacturer in a products liability case. Further, the trial court should have ruled as a matter of law

that plaintiff's own acts in deliberately and voluntarily exposing himself to a known danger barred him from recovery.

In our recent case of *Bereman v. Burdolski,* 204 Kan. 162, 460 P. 2d 567, we placed contributory negligence and assumption of risk in implied warranty cases in final perspective by holding:

". . . Along with many courts we have generally adhered to the view contributory negligence and assumption of risk are separate defenses but confusion has sometimes resulted from efforts made to distinguish them in all cases. We shall not attempt further refinement here—instead we shall try to avoid semantic problems. Several courts have now abandoned use of the phrases [sic] contributory negligence and assumption of risk in implied warranty cases and, instead, approach the problems of a defense of that character in terms of causation. . . ." (p. 165.)

Also, in Syllabus ¶ 1 we said: "An unreasonable use of a product after discovery of a defect and becoming aware of the danger is a defense to an action for damages for breach of implied warranty of fitness." It logically follows that before this rule is applicable the injured person must have discovered the defect and must have been aware of the danger. Whether or not this is true is a question of fact.

In *Bereman,* the court quoted at length from 2 Frumer-Friedman, Products Liability (16.01 [3]). In this quote appears the following:

"'. . . In the case of an *express* warranty, contributory negligence should clearly not be a defense, where the injury results from an unknown defect [sic] warranted against, and the contributory negligence is just that and not the equivalent of unreasonable exposure to a known and appreciated risk. . . .'" (p. 169.)

We conclude that contributory negligence and assumption of risk in their normal meaning are not defenses to an action based on the breach of an express warranty.

Defendant further claims:

". . . [A] reasonable construction must be placed on any express warranty issued by defendant, and the risk for which defendant is legally responsible must be stated in terms of reasonably anticipated or foreseen circumstances resulting from an unbroken chain of causal relationship and without some intervening occurrence or accidental or substantial change in the condition of the warranted product. Defendant cannot in law be held to have warranted the 600 amp switch under any and all circumstances or against any unforeseen or unanticipated occurrence, event or subsequent change."

Our Kansas decisions on foreseeability in express warranty actions are limited to actions by buyers. In *Naaf v. Griffiths,* supra, Syl. ¶ 4, we have stated the rule as follows:

". . . [I]n a proper case, special or consequential damages may be recovered where they proximately result from the breach and may reasonably be

regarded as having been within the contemplation of the contracting parties." (p. 64.)

Our leading case on general foreseeability is *Cleghorn v. Thompson,* 62 Kan. 727, 64 Pac. 605, in which defendant discharged a rifle at some dogs, the bullet ricocheting off frozen ground and hitting plaintiff who happened to be passing along a nearby road. We held that the law does not make defendant an insurer of consequences which reasonable foresight could not have prevented.

In *Whiting Corporation v. Process Engineering, Inc.,* 273 F. 2d 742 (1st Cir. 1960), the court pointed out that an express warranty and an implied warranty may both exist. In this situation, the court extends the express warranty to the field of warranty covered thereby and extends implied warranty of reasonable fitness for the purpose for which the product was bought. The court further said at page 745:

". . . It is not necessary for us to decide where this case falls. An implied warranty of fitness does not extend beyond operating conditions that the seller knew of, or should reasonably have anticipated. . . ."

We believe, in the absence of other explanation, that the source of electricity resulting in damage to the panel must have been electricity from lightning. The parties each argue as to foreseeability of lightning striking an electrical circuit.

Plaintiff says: ". . . [L]ightning is not such a rare phenomenon as to tax the memory of man, nor is the incidence of lightning striking an electrical system so unusual as to be considered unforeseeable. . . ."

Defendant says:

". . . Not even a strict liability state would hold that defendant at bar should reasonably anticipate that a 600 amp switch, tested to 3600 amps, and installed by plaintiff inside a building, would be struck by a lightning charge carrying something in excess of 82,500 amps, welding one of three sets of contact blades—and further foresee that plaintiff—a journeyman electrician who installed the equipment and knew the visible blades were for inspection purposes—would come to repair the system, and after observing smoke damage and being informed of the lightning, work the system "hot" without checking the line for charge with either one of his two readily available testers—and further foresee that if plaintiff left a left side amp switch open, that electricity from the C-phase of the 600 amp switch would travel the internal circuitry of the ice plant and shock plaintiff while working on the A-phase."

Although plaintiff argues foreseeability is not applicable in express warranty cases, we believe the better reasoning is to the contrary. We do not charge defendant with the obligation of foreseeing all

the facts made in defendant's argument. We feel that the jury might reasonably charge defendant with the duty of foreseeing that an electrical circuit might be struck by lightning and damage occur by reason of the breach of the express warranty. We cannot say as a matter of law that the incidence of lightning striking an electrical system is such a rare phenomenon under the circumstances in this case that it could not have been reasonably foreseen or anticipated. (See *Whiting Corporation v. Process Engineering, Inc.*, supra, and *Arnold v. United States Rubber Company*, 203 So. 2d 764 [La. App. 1967].)

In view of the foregoing we conclude that defendant's motions for judgment were properly overruled. From what has been said, we necessarily must also find that the trial court erred in refusing to give an instruction on the defendant's duty to foresee or reasonably anticipate. We approve the basic rule contained in defendant's requested instruction No. 15, but it does not fully cover the foreseeability rule expressed in this opinion.

The significance of the defense asserted by defendant that this injury was solely and proximately caused by an "Act of God" should be analyzed in relation to the facts in this case. The definition of an "Act of God," repeatedly used in our decisions, was last expressed in *Lee v. Mobil Oil Corporation*, 203 Kan. 72, 452 P. 2d 857, as follows:

"An 'act of God' as known in the law is an irresistible superhuman cause, such as no reasonable human foresight, prudence, diligence and care can anticipate and prevent." (Syl. ¶ 1.)

Also, in *Fairbrother v. Wiley's, Inc.*, 183 Kan. 579, 331 P. 2d 330, we stated:

"Where an act of human negligence and some force of nature have concurred to produce an accident and injury, the fact that the force of nature contributed to the accident and injury does not excuse the human negligence where the actor should have anticipated the occurrence of such force of nature and foreseen that failure to exercise reasonable care under the circumstances would probably cause injury, nor is the actor relieved from liability for negligence on the excuse that the proximate cause was a so-called 'Act of God' where the injury would not have occurred but for the act of human negligence which contributed thereto." (Syl. ¶ 3.)

Since an "Act of God" depends upon the inability of a human being to foresee its occurrence, the role of an "Act of God" as a defense would be fully covered by the requirement of foreseeability as previously discussed in this opinion. In view of this we believe

the issues in this case will be more clearly defined by eliminating an instruction defining an "Act of God." We therefore hold that requested instruction No. 14 should not have been given, but that the liability of the manufacturer based on the breach of an express warranty when coupled with a foreseeable intervening cause should be fully covered.

We hold that the trial court did not err in refusing to enter judgment for defendant as a matter of law, but did err in failing to instruct in accord with the law as determined herein.

Reversed with directions to grant defendant a new trial in accordance with the views expressed herein.

SCHROEDER, J., dissenting: On the record here presented the decision of the court seems to impose absolute liability where an express warranty is made by the manufacturer of an industrial product. That is, the manufacturer absolutely guarantees the performance of its goods against product-induced injury under any and all circumstances, regardless of unforeseen intervening occurrences.

It seems to me where an intervening cause gives rise to an injury resulting from a manufactured product covered by express warranty, the basic question should be one of reasonable foreseeability just as in negligence cases. The warranty's existence and breach should be determined in the light of the contemplation of the parties at the time the product is sold and delivered. A plaintiff should be permitted to recover for injuries which the defendant manufacturer had reason to foresee as a probable result of a breach at the time the sale was made. (2 *Frumer and Friedman,* Products Liability, § 16.01 [4] [1970].) An express warranty should not be interpreted to include conditions or intervening occurrences that neither party had reason to anticipate. (*Tamburello v. Travelers Indemnity Company* [E. D. La. 1962] 206 F. Supp. 920.) In other words, the plaintiff must prove the breach of the express warranty to be the proximate cause of his injury.

In *Naaf v. Griffitts,* 201 Kan. 64, 439 P. 2d 83, this court held that under an express warranty special damages could be recovered when they *proximately result* from the breach and may reasonably be regarded as having been within the contemplation of the parties.

For a case involving an express warranty concerning agricultural seed, see *Anderson v. Thomas,* 184 Kan. 240, 336 P. 2d 821.

A full discussion of the foreseeability of an intervening cause in

a negligence case may be found in *Steele v. Rapp,* 183 Kan. 371, 327 P. 2d 1053.

The uncontradicted evidence in this case discloses that the 600 amp QMQB switch was free from defects when it left the manufacturer and at the time of installation; that after the switch had been installed at the Kansas Cold Storage Company in the city of Wichita, a bolt of lightning struck the plant during an electrical storm which fused or welded together one of the three sets of moveable contact blades in the switch.

As the name implies, "600 amp QMQB switch," the switch was protected by 600 amp fuses.

The evidence is uncontradicted that upon testing an identical switch of this design after the occurrence, 82,500 amperes were run through the closed contacts of the switch but this was insufficient to weld the contacts together. Thus, the surge of electricity which went through the switch here in question welding the contacts exceeded 82,500 amperes, *but the 600 amp fuses designed by the manufacturer to protect the switch did not blow.* The fuses failed to perform their function.

An expert engineering witness, Arthur Worth, testified:

". . . The switch is designed to carry 600 amps but is actually tested at six times 600 amps. If a contact or blade welded shut it very likely took something in excess of 82,500 amps to accomplish. In my opinion, it had to be a very fast surge of current to have welded the blade or contact without blowing the fuses. Lightning could supply the type of surge that would cause this sort of thing."

Even if it be assumed that the manufacturer in this case was obligated to foresee that lightning might strike the electrical system controlled by the 600 amp QMQB switch, the manufacturer should not be held to foresee that a tremendous surge of electricity in excess of 82,500 amps *would go through a 600 amp fuse without blowing it* and result in fusing or welding the contact blades of the switch.

It is respectfully submitted the trial court should have entered judgment for the defendant as a matter of law.